UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, <br><br> Plaintiff, <br><br> vs. <br><br> PAUL RICHARD GASSMANN, SAMUEL HERB, SHANE BRANSON, CHRISTOPHER SHARPE, and MICHAEL MELDGAARD, <br><br> Defendants. | CV 08-04833-DSF-PLAx <br><br> FINDINGS OF FACT AND CONCLUSIONS OF LAW |

The matter came on for trial before the Court sitting without a jury, on December 1, 2009. Following the presentation of evidence and argument, the matter was taken under submission. The Court now makes the following findings of fact and reaches the following conclusions of law.

### I. Findings of Fact

1. Plaintiff Allstate Insurance Company issued Personal Umbrella Policy Number 914675574 ("the Policy") to Oliver Clark, III and Jean Clark.

2. On July 23, 2009, Allstate filed this declaratory relief action, seeking a determination that it is not required to provide liability coverage to Defendant Paul

1 Richard Gassmann under the Policy as an additional insured resident relative of Mr.
2 Clark's household at the time of the accident.
3     3.    The Policy was in effect on April 28, 2007, the date of the accident that
4 gives rise to this litigation.
5     4.    The Policy provides that Allstate will pay damages of up to $5,000,000
6 that an insured person becomes legally obligated to pay because of bodily injury,
7 personal injury or property damage arising from an occurrence.
8     5.    The policy definition of "insured person" includes "any person related to
9 [the insured or the insured's resident spouse] by blood, marriage or adoption who is
10 a resident of [the insured's] household."  "General Provisions" on page 2 of the
11 Policy.
12     6.    The Policy does not include definitions for the terms "resident" or
13 "household."
14     7.    The Policy coverage includes "an occurrence arising only out of . . .
15 [p]ersonal activities of an insured person, including the permissive use of a land
16 vehicle or watercraft owned by an insured person." *Id.* at 5 (first paragraph under
17 "Losses We Cover Under Coverage XL").
18     8.    The Policy exclusions include that the Policy will not apply "[t]o any
19 occurrence arising out of bodily injury or personal injury to an insured person" or
20 "[t]o property damage to any . . . property owned by an insured person." *Id.* at 6
21 (paragraphs 6 and 7 under "Exclusions – Losses We Do Not Cover Under Coverage
22 XL").
23     9.    Gassmann, whose date of birth is August 7, 1987, is a blood relative of
24 Jean Clark and has always had a close relationship with his grandparents, Oliver and
25 Jean Clark, who played a major role in raising him.  The Clarks' home is located at
26 16601 Carousel Lane, Huntington Beach, which is also the insured address.
27     10.    Prior to 1999, Gassmann resided with his mother in the Long Beach
28 area, and visited his grandparents on a frequent basis.

2

11. Between 1999 and 2001, Gassmann attended boarding school in Anaheim, and at the New Mexico Military Institute in New Mexico. His grandparents paid for this schooling and associated expenses. Gassmann spent vacation and break time at his grandparents' home.

12. Between 1999 and 2001, while Gassmann was attending boarding school, he resided almost exclusively with his grandparents in Huntington Beach when on vacation or during breaks from school.

13. In 2001, his grandparents became Gassmann's legal guardians. They remained Gassmann's legal guardians until he reached age 18 in August 2005.

14. In 2002, Gassmann attended Marina High School in Huntington Beach. While attending Marina High School, Gassmann resided with his grandparents in Huntington Beach.

15. From September 2002 through June 2005, Gassmann attended high school in Fallbrook.

16. After graduating from high school in 2005, Gassmann worked for Custom Quality Painters in Fallbrook for "a few months."

17. From approximately September 2002 through approximately October 2005, while Gassmann attended high school in Fallbrook and thereafter worked for Custom Quality Painters in Fallbrook, Gassmann lived during the week at his mother's home on De Luz Road in Fallbrook. He went to his grandparents' home in Huntington Beach on two or more weekends per month. In that same time frame, he acquired his driver's license, which listed the De Luz Road address as his residence.

18. At some point beginning in late 2005 or early 2006, after working as a painter in Fallbrook, Gassmann worked for Oliver Clark's Company, O.E. Clark Paper Box Company, in Vernon. This employment lasted several months but less than a year.

19. In autumn 2006, and through the holiday season, Gassmann worked for

See's Candies in Westminster, and attended Cerritos College to learn marine-engine repair. Westminster is a city adjacent to Huntington Beach.

20. In 2006 and 2007, Gassmann had a number of friends who lived in Fallbrook, and, as of 2007, also had a girlfriend, Christina Phillips, age 17, who resided with her mother in Fallbrook.

21. When he began working for O.E. Clark Paper Box Company, Gassmann had complete access to his grandparents' Huntington Beach home without restriction. This included having his own house key, his own bedroom, and his own closet. He usually slept from one to three nights per week at his grandparents' home. During this same period of time, Gassmann would sleep over at varying intervals on the couch at his half-brother's two-bedroom apartment. Gassmann had no key to his half-brother's residence. He did not have a closet or a bedroom at his half-brother's residence, and he kept no personal items there. The half-brother had two roommates, and his girlfriend occasionally spent the night at the apartment as well.

22. When Gassmann slept at his grandparents' house, he usually arrived late in the evening, grabbed something to eat from the refrigerator, went to sleep, and left in the morning without eating breakfast with his grandparents.

23. On most weekends, Gassmann visited his girlfriend, his mother and other friends, including Megan McKenna in Fallbrook. While in Fallbrook, Gassmann would sleep either at his mother's home or on the couch at Megan McKenna's home. Gassmann had no key to Megan McKenna's home; he had no closet or bedroom and kept no personal items there. He stayed there only by invitation.

24. Prior to June of 2006, Gassmann had his own bedroom, his own closet, and full utilization of his mother's residence on De Luz Road. He had full utilization of the entire house and its amenities, including the right to come and go without his mother's knowledge and permission, whether or not his mother was home. During this time frame he kept personal property at his mother's home, including a TV,

4

1  guitar, stereo, and drum set.

2      25.    In June 2006 Gassmann's mother, Cheryl Hayworth, remarried. Her
3  new husband and his two children moved into the De Luz Road house. Thereafter,
4  when Gassmann stayed at his mother's house, he would share a bedroom with his
5  mother's stepchildren. He continued to have access to her home and its amenities
6  and continued to keep the personal property identified in paragraph 24 at his
7  mother's residence.

8      26.    From autumn 2006 and through the holiday season, Gassmann's living
9  and sleeping arrangements were the same as stated in paragraphs 21 through 25.

10      27.    On April 12, 2007 Gassmann began working as an independent
11  contractor for Amber Marine in Costa Mesa as a marine technician. Costa Mesa is
12  an adjacent city to Huntington Beach. Gassmann continued working with Amber
13  Marine until May 2008.

14      28.    When he started working for Amber Marine, Gassmann at least
15  contemplated that his lifestyle would change somewhat because, due to his new work
16  schedule, he would no longer be able to "hang out" as often or as long with his
17  half-brother as he once did. His new job required an earlier starting time than had
18  attending classes at Cypress College. Gassmann began spending "a little more time"
19  in Orange County at that point, but his living arrangements did not change
20  dramatically. He continued to sleep at his half-brother's apartment. He continued
21  to visit his mother, girlfriend and other friends in Fallbrook on most weekends, and
22  his sleeping arrangements in Fallbrook were the same as stated in paragraphs 23-25.

23      29.    As of spring 2007, Gassmann did not have his own room at his mother's
24  house in Fallbrook, nor did he not have his own key to his mother's house.
25  However, at all times, he had access to a hidden key that was used by family
26  members.

27      30.    At no time did Gassmann have a key to his half-brother's apartment, the
28  residence of Megan McKenna, or the residence of his girlfriend's mother.

5

31. At no time did Gassmann have the right to enter, without invitation, his half-brother's apartment, the residence of Megan McKenna, or the residence of his girlfriend's mother.

32. At no time did Gassmann have a bedroom, closet or other personal items of his own at his half-brother's apartment, the residence of Megan McKenna, or the residence of his girlfriends' mother.

33. At all material times, Gassmann had his own key to his grandparents' home and access to a family key at his mother's residence.

34. At all material times, Gassmann had his own bedroom at his grandparents' home, his own closet, and full utilization of the entire house and its amenities, including the right to come and go without his grandparents' knowledge or permission, whether his grandparents were home or not. Gassmann could bring guests to his grandparents' home and did so on occasion, whether or not his grandparents were home. He maintained personal property at his grandparents' home, including clothing, all necessary toiletry items, sports memorabilia, a computer, guitar, pictures and posters, a surfboard, scuba equipment and his powerboat, which was moored at his grandparents' slip in front of the property. Gassmann was required to clean his room and bathroom and to take out the trash when he was there. His grandmother did his laundry, which Gassmann was required to fold and put away.

35. At all material times, Gassmann's bedroom at his grandparents' house was used by occasional house guests when Gassmann was not there.

36. In spring 2007, when Gassmann would travel down to Fallbrook for the weekend, he would first stop at his grandparents' home to retrieve his toiletries and any other personal items he might need for however long he planned to be in Fallbrook.

37. On Friday, April 27, 2007, Gassmann received his first paycheck from Amber Marine. After work, he returned to his grandparents' home, gathered a few

1 personal items such as clothing, and was given the keys to his grandparents' truck.
2 He then traveled to Fallbrook to celebrate the occasion with friends and his
3 girlfriend, and he intended to return to his grandparents' home on Sunday, April 29,
4 2007.

5     38.    The accident for which coverage is contested occurred in Fallbrook
6 during the early morning hours of Saturday, April 28, 2007. At the time of the
7 accident Gassmann was driving his grandparents' vehicle, which he was using with
8 their permission.

9     39.    Following the accident, Gassmann remained in Fallbrook for a couple
10 of weeks to attend to matters associated with the accident. During this time span, he
11 stayed at his mother's house on De Luz Road Thereafter, he returned to work at
12 Amber Marine in Huntington Beach and continued working there until
13 approximately May 2008.

14     40.    In 2008, his grandparents purchased a "fixer upper" property at 540
15 Teran Drive in Fallbrook ("Teran property"). Gassmann undertook renovation of
16 the property. In approximately October 2008, he moved into the Teran property
17 where he continued to live as of the date of trial.

18     41.    Gassmann's grandparents have provided financial support to Gassmann
19 since 1999, including but not limited to paying tuition and costs associated with
20 boarding school and school expenses for Marina High School; providing Gassmann
21 with spending money; paying for his cell phone; purchasing clothing for him; paying
22 for boat maintenance, boat insurance, boat registration; purchasing him a car; paying
23 for his health insurance; and permitting him to live rent-free at the Teran property.

24     42.    At all material times to the present, Gassmann's dentist is and has been
25 Dr. Tito Dang, whose Huntington Beach office is "very close" to his grandparents'
26 house.

27     43.    At all material times, Gassmann received U.S. mail at both the De Luz
28 Road and Carousel Lane addresses.

44. Gassmann's Western International University Financial Aid Application, which he signed on December 20, 2005, lists no address. However, March 27, 2006 financial aid correspondence to Gassmann from Western International University is addressed to him at 39255 De Luz Road, Fallbrook.

45. Gassmann's 2006 W-2 issued by O.E. Clark Box Company reflects his grandparents' address as Gassmann's address and was sent by U.S. mail to that address.

46. Gassmann's 2007 California Lifetime Fishing License was issued to him on November 27, 2006, and which is signed by him, states his address to be 16601 Carousel Lane, Huntington Beach.

47. The Amber Marine Independent Contractor Contract executed on April 12, 2007, which was completed by Gassmann in his own handwriting, lists his grandparents' address as his address.

## II. Conclusions of Law

Gassmann is an "insured person" within the meaning of the Policy because he is a person related to the named insured and was, at the time of the accident on April 28, 2007, a resident of the insured's household.

An insurance policy is subject to the same rules that apply to the construction of contract language, and "the mutual intention of the parties at the time the contract is formed governs its interpretation." *Montrose Chemical Corp. v. Admiral Ins. Co.*, 10 Cal.4th 645, 666 (1995) ("Such intent is to be inferred, if possible, solely from the written provisions of the contract."). In the absence of any ambiguity in the relevant policy language, "the written provisions of the policy are to be interpreted in their ordinary and popular sense, . . . unless used by the parties in a technical sense, or unless a special meaning is given to them by usage." *Id.* (citations and internal quotations omitted). Stated otherwise, "[i]f the meaning a layperson would ascribe to the language of a contract of insurance is clear and unambiguous, a court will apply that meaning." *Id.* at 666-67.

"A court that is faced with an argument for coverage based on assertedly ambiguous policy language must first attempt to determine whether coverage is consistent with the insured's objectively reasonable expectations." *Bank of the West v. Superior Court*, 2 Cal.4th 1254, 1265 (1992). In cases involving ambiguity in policy language, ambiguities generally are resolved in favor of coverage. *Montrose Chemical*, 10 Cal.4th at 667. Additionally, coverage provisions generally are interpreted broadly "in order to protect the objectively reasonable expectations of the insured." *Id.* (quoting *AIU Ins. Co. v. Superior Court*, 51 Cal.3d 807, 822 (1990) (internal quotations and alterations omitted)). Where, as here, a potentially ambiguous term is used in both coverage and exclusion clauses, "the term should be given its ordinary reading, free from unusual extending or limiting connotations." *California Casualty Indemnity Exchange v. Frerichs*, 74 Cal.App.4th 1446, 1453 (1999); *see also id.* at 1449 (explaining that the court would give the phrase "resident of the insured's household," which appeared in both coverage and exclusion clauses of the policy at issue, "its ordinary meaning as to dwell permanently or for a considerable length of time").

Here, the central question before the Court is whether Gassmann was a "resident" of the Clarks' "household" on the morning of April 28, 2007, when the accident for which coverage is contested occurred. Given Gassmann's somewhat itinerant lifestyle at the time of the accident, the issue becomes whether Gassmann was resident in any household and, if so, which household(s).

The terms "resident" and "household" are not ambiguous. *See Utley v. Allstate Ins. Co.*, 19 Cal.App.4th 815, 822 (1993) ("[T]he common thread that runs through [cases interpreting 'resident' and 'household'] is not whether the terms 'resident' or 'member of the household' are themselves inherently ambiguous, but whether, under the particular facts of each of those cases, insurance coverage was extended or excluded under the terms of the policy in question." (quoting *Safeco Ins. Co. v. Gibson*, 211 Cal.App.3d 176, 181 (1989))); *see also Safeco*, 211 Cal.App.3d

9

at 180-182 (noting that the terms "resident" and "household" had required interpretation in the past but rejecting the argument that the policy was ambiguous). In the context of cases involving the residence of minor children who, pursuant to custody agreements, spend time in the separate homes of their divorced parents, California courts have determined that "the term 'residence' 'connotes any factual place of abode of some permanency, more than a mere temporary sojourn." *Reshamwalla v. State Farm Fire and Cas. Co.*, 112 F.Supp.2d 1010, 1016 (E.D.Cal. 2000) (citing *Kibbee v. Blue Ridge Ins. Co.*, 69 Cal.App.4th 53, 61-62 (1999) (quoting *Utley v. Allstate Ins. Co.*, 19 Cal.App.4th 815, 820 (1993) (quoting *Smith v. Smith*, 45 Cal2d 235, 239 (1955)))). Although the definition of "resident" has been framed somewhat differently in cases involving adult children,[1] a California Court of Appeal has clarified that the concept of "dual residences" is not limited to cases involving minor children. *Utley*, 19 Cal.App.4th at 821-22 (collecting cases in support of the conclusion that "a relative may be a resident of the insured's household even though he or she does not live in the household on a daily basis").

In *Utley*, an adult son was living at his parents' home for approximately seven or eight months between the time of his discharge from the military and his planned marriage, after which he planned to move to a new condominium with his new wife.

---

[1] In *California Casualty Indemnity v. Frerichs*, 74 Cal.App.4th 1446 (1999), the California Court of Appeal stated that "[t]o reside is: "To dwell permanently or for a considerable time, to have one's settled or usual abode, to live, in or at a particular place." *Id.* at 1453 (quoting 8 Oxford English Dictionary 517 (1993)). However, in a footnote to that definition, the Court of Appeal cited an earlier decision for the proposition that " 'a resident of the same household is one, other than a temporary or transient visitor, who lives together with others in the same house for a period of some duration, although he may not intend to remain there permanently.' " *Id.* at 1453 n.2 (quoting *Hardware Mutual Casualty Co. v. Home Indemnity Co.*, 241 Cal.App.2d 303, 311 (1966)).

*Id.* at 818-19. Analyzing a "resident relative" exclusion,[2] a Court of Appeal found that the "dual residence" principle applied where "[a]ssuming for the moment that [the son]'s primary 'residence' was San Diego [where he had been stationed in the military], the record show[ed] that he used his parent's house as a second residence." *Id.* at 822. Although the son had two bank accounts in San Diego and had not changed the address on his driver's license to that of his parents' home, during the months between his discharge and his marriage, the son slept, ate, and kept his belongings at the parents' home, and he used their address to establish a new bank account. *Id.* at 819, 821; *see also id.* at 822 (concluding that "the assertion that [the son] could not become a 'resident' of the parents' household until he changed his 'domicile' [was] unavailing"[3]).

The facts in *Utley* are distinguishable from those in cases in which an adult child has changed his domicile. For example, in *California Casualty*, the court

---

[2]"The concept of a household exclusion is a common one which has long enjoyed judicial support. Its purpose is to prevent suspect inter-family legal actions which may not be truly adversary and over which the insurer has little or no control. Such an exclusion is a natural target for the insurer's protection from collusive assertions of liability..." *Utley*, 19 Cal.App.4th at 822-23 (1993) (internal quotations, alterations, and citations omitted).

[3]As the Court of Appeal explained in *Utley*:
> A "domicile" is "... the one location with which for legal purposes a person is considered to have the most settled and permanent connection, the place where he intends to remain and to which, whenever he is absent, he has the intention of returning.... [W]hereas 'residence' connotes any factual place of abode of some permanency, more than a mere temporary sojourn.... [A] person may have only one domicile at a given time, but he may have more than one physical residence separate from his domicile and, at the same time."

*Id.* at 820 (quoting *Smith v. Smith*, 45 Cal.2d 235, 239 (1955)).

11

found that a 41-year-old man who had moved out of his parents' home in November 1995, was not a "resident" of his parents' household during a two-and-a-half week stay to house-sit for his parents in July 1996. *California Casualty*, 74 Cal.App.4th at 1453. Similarly, in *Freudenberger v. Allstate Ins. Co.*, 941 F.Supp. 940 (S.D. Cal 1996), the district court found that, although the insureds' 19-year-old son occasionally stayed overnight at his parents' home, did laundry there, stored some property in his parents' garage, and used their address as his permanent mailing address because he "constantly changed addresses," he was no longer a resident of his parents' household in light of the fact that he had rented his own apartment in another town at least six months prior to the occurrence at issue in that case. *Id.* at 941, 944.

Here, although he did not sleep every night or eat most of his meals at his grandparents' house, Gassmann established by a preponderance of the evidence that, at the time of the accident that occurred on April 28, 2007, he had not established a domicile elsewhere.[4] His grandparents' house in Huntington Beach was for him, in the language of *Smith*, a "place of abode of some permanence" and "more than a mere temporary sojourn." *Smith*, 45 Cal.2d at 239. Stated otherwise, applying the ordinary meaning of the phrase "resident of the insured's household" to the facts of this case, Gassmann has made a sufficient showing that his grandparents' house in Huntington Beach was his "settled or usual abode," and he most certainly was not

---

[4]"The burden is on an insured to establish that the occurrence forming the basis of its claim is within the basic scope of insurance coverage. And, once an insured has made this showing, the burden is on the insurer to prove the claim is specifically excluded." *Aydin Corp. v. First State Ins. Co.*, 18 Cal.4th 1183, 1188 (1998) (citations omitted); *see also id.* at 1192 (1998) (explaining that, for purposes of allocating the burden of proof, an exception to a policy exclusion may be construed as a coverage provision where the exception serves to reinstate coverage that would otherwise be barred by an exclusion).

a temporary visitor in the house. *Cf. California Casualty*, 74 Cal.App.4th at 1453 n.2.

It is clear that Gassmann was a member of his grandparents' household until he began attending high school in Fallbrook in 2002. Gassmann's grandparents remained his legal guardians until August 2005. He established by a preponderance of the evidence that, even if he could be said to have abandoned that residence and made his mother's home in Fallbrook his sole residence when he began attending high school in Fallbrook in late 2002, he was again a member of his grandparents' household once he began working in Orange County again in late 2005 or early 2006. His grandparents' house was the one residence to which he had his own key and unfettered access; it is where Gassmann had his own room and where he kept his toiletries and many other personal items that he valued. Additionally, just weeks before the April 28, 2007 accident, Gassmann used his grandparents' address as his home address on the paperwork he completed in connection with commencing employment with Amber Marine. The fact that he did not change the address on his driver's license from his mother's house in Fallbrook to his grandparents' house in Huntington Beach does not negate Gassmann's showing, nor do the facts that he had access to a key to his mother's house, left some belongings at her house, and received mail at both residences.

Under the unambiguous terms of the Policy, Gassmann need not establish that his grandparents' home was his sole, or even his primary, residence. Even assuming that his mother's house served as an additional residence for Gassmann, the evidence establishes that, on April 28, 2007, Gassmann was a dual resident of both his grandparents' house and his mother's house. Accordingly, the Court holds that Gassmann has established by a preponderance of the evidence that the accident is within the scope of coverage under the Policy. Allstate concedes that no exclusion applies to preclude coverage, and Allstate has not shown that it is more likely than not that Gassmann was not a resident of his grandparents' household.

Counsel for defendants is directed to provide a Judgment for the Court's signature.

**IT IS SO ORDERED.**

Dated this 24th day of April 2010.

_____
DALE S. FISCHER
United States District Judge